UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAKOTA KING HUTTON, an individual, and EMILY THAYER, an individual,<br><br>     Plaintiffs,<br><br> v.<br><br>BLAINE COUNTY SCHOOL DISTRICT #61, an Idaho public school district; GWENCAROL HOLMES, individually and in her official capacity as Superintendent of the Blaine County School district; AMANDA LACHANCE, individually and in her official capacity as Clerk of the School Board; HEATHER CROCKER, individually and in her official capacity as Director of Communications; TERESA MCGOFFIN, individually and in her official capacity as Director of Technology; JOHN P. PEARCE, individually and as Principal of Wood River High School; KEITH NELSON, individually and in his official capacity as Vice Principal of Wood River High School; MICHAEL GLENN, individually and in his official capacity as Principal of Silver Creek High School; and JOHN DOE, whose true name is not yet known to the Plaintiffs, individually and in their official capacity as the person managing information on the Blaine County School District Google Drive and/or other relevant information sharing and storage systems,<br><br>     Defendants. | Case No. 1:19-cv-00116-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

# I. INTRODUCTION

This matter comes before the Court on Defendants'[1] Motion to Dismiss (Dkt. 5) and Motion to Bifurcate (Dkt. 7). The Court heard oral arguments on the motions on January 23, 2020 and took the motions under advisement. Having reviewed the record and the briefs, and for the reasons stated below, the Court finds good cause to GRANT in part and DENY in part Defendants' Motion to Dismiss (Dkt. 5) and DENY Defendants' Motion to Bifurcate (Dkt. 7).

# II. BACKGROUND[2]

Plaintiffs' claims arise out of two separate incidents. The Court will review the facts of each.

## A.  Dakota King Hutton

Dakota  Hutton was a senior at Wood River High School (WRHS) during the fall of 2017. Hutton had an assignment in her AP Government class to create an opinion poll and have thirty random students or staff participate in the poll. Hutton created a five-question poll. Three of those questions related to Blaine County School District #61's (the "District") Superintendent GwenCarol Holmes. Hutton sent out the poll via the District's Google Drive to other students in various high schools in the District. Hutton did not send this poll out to the general public.

---

[1] "Defendants" collectively refers to Blaine County School District # 61, GwenCarol Holmes, Amanda LaChance, Heather Crocker, Teresa McGoffin, John. P. Pearce, Keith Nelson, and Michael Glenn, all of whom are represented together.

[2] The facts in this section come from Plaintiffs' Complaint (Dkt. 1) and are accepted as true. *Wilson v. Lynch*, 835 F.3d 1083, 1092 (9th Cir. 2016).

On November 6, 2017, a teacher at Carey High School brought the poll to the attention of Defendant Teresa McGoffin, Director of Technology for the District.[3] McGoffin sent the poll to Vice Principal Keith Nelson who deemed it "innocent enough." Dkt. 1, at 9. The next day, McGoffin sent the poll to Superintendent GwenCarol Holmes.

On November 8, 2017, Holmes emailed the District's Board of Trustees (the "Board") and Board Clerk Amanda LaChance about the poll. Holmes indicated the poll was an "evaluation" of her. She also informed the Board that McGoffin and the Director of Communications, Heather Crocker, had "shut the survey down." *Id.* at 10. Hutton's poll was deleted, and Hutton was questioned by Nelson. That same day, Holmes emailed the AP Government teacher stating that the poll violated Idaho Code in some way and suggested more appropriate content. The AP Government teacher was required to apologize to Holmes.

On May 23, 2018,  Hutton's attorney sent a letter to the Board explaining the events of the past November and requesting a meeting with the school administrators and Holmes in the presence of the Board. The letter also requested an apology to Hutton and to the AP Government teacher.

On May 31, 2018, the Board sent a letter back to Hutton, denying any wrongdoing and declining to set up a meeting. The Board did indicate, however, that Hutton could address it in a public meeting. On July 3, 2018, Hutton's attorney sent a follow-up letter once again requesting an apology. The Board did not respond to the follow-up letter.

---

[3] Apparently, Hutton unintentionally sent the email to the Carey High School teacher due to a mistyped email address.

On July 17, 2018 Hutton made public comment to the Board through her attorney, explaining Hutton's concern and disappointment.

## B. Emily Thayer

Emily Thayer was a WRHS Student Board Representative for her junior and senior years of high school. As part of her duties, Thayer prepared and submitted a monthly report to the Board, according to District Policy 220.10. This policy stated that Thayer should "represent, to the best of her knowledge, the opinion and issues of the students who she represents," and that she should also, "state her individual opinion in order to help inform Board discussion and decisions." *Id.* at 12–13.

Thayer drafted a report which detailed concerns that the students had about the change to the graduation date. Thayer's mentor approved the report. On September 12, 2017, Thayer submitted her report to the Student Board Liaison to the Board, Sara Begay. Begay was also a Student Board Representative for Silver Creek High School. Holmes and Silver Creek High School Principal Mike Glenn told Begay she could not submit Thayer's report in full. Glenn and Holmes instructed Begay to remove the section of Thayer's report that discussed the student's concerns to the change in the graduation date. Begay informed Thayer of these concerns and instructions.

Thayer redrafted her report in an effort to make the identified section as polite and respectful as possible. Thayer sent this new draft to Begay. Thayer and her mentor also reached out to Vice Principal Grafft to ensure the report complied with school policy. Grafft approved the report.

MEMORANDUM DECISION AND ORDER –4

Thayer and her mentor contacted Board Clerk LaChance to make sure the report was presented in its entirety at the next Board meeting. Thayer's mentor put a physical copy of the report on Begay's seat in the meeting room the day of the meeting. Despite these efforts, Thayer's report was not presented in full and the section about the graduation date was omitted.

On September 18, 2017, LaChance sent an email to Thayer and the other student representatives which clarified new procedures regarding the student reports. The email clarified that the student report was a time to "provide an update on your school" and to "share the good news." *Id.* at 15.

On October 9, 2017, Thayer sent an email to the Board, informing them of the redaction of her report and attaching the section. Ellen Mandeville was the only trustee to respond to the email. Mandeville stated that she was unaware of the report and new interpretation of policy and would get back to Thayer later. Mandeville never followed up with Thayer.

Sometime later, Thayer's father asked Glenn why the report was redacted. Glenn informed him that Holmes had directed that the report be redacted.

Thayer and Hutton filed this suit on April 8, 2019. Both Hutton and Thayer (collectively, "Plaintiffs") have made three identical claims: (1) Violation of Plaintiffs Rights to Free Speech Under the First and Fourteenth Amendments (42 U.S.C. § 1983); (2) Violation of Freedom of Speech Under the Idaho Constitution; and (3) Declaratory Judgment and Injunction (28 U.S.C. § 2201). In addition to declaratory judgment and injunctive relief, Plaintiffs seek monetary damages.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a case if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1121. A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements will not do." *Twombly*, 550 U.S. at 555. The complaint must also contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570. In considering a Rule 12(b)(6) motion, the Court must view the complaint in the light most favorable to the claimant and "accept[] all well-pleaded factual allegations as true, as well as any reasonable inference drawn from them." *Johnson*, 534 F.3d at 1122.

Finally, in determining whether a Rule 12(b)(6) dismissal should be granted, the Court may not look at matters outside the complaint. *Schneider v. Calf. Dep't of Corrections*, 151 F.3d 1194, 1197 (9th Cir. 1998). However, the Court can take judicial notice of any document not attached to the complaint if the complaint specifically refers to

it and its authenticity is not questioned. Fed. R. Evid. 201(f); *Townsend v. Columbia Operations*, 667 F.2d 844, 848–49 (9th Cir. 1982).

## IV. ANALYSIS

Defendants suggest the Court should dismiss both Hutton and Thayer's claims for failure to state a claim upon which relief can be granted. First, Defendants argue that Plaintiffs' claims for declaratory and injunctive relief should be dismissed due to lack of standing and mootness. Defendants also contend that Plaintiffs' claims should be dismissed because Defendants enjoy both Eleventh Amendment and qualified immunity, depending on each defendant's respective status.[4] The Court will address each argument in turn.

### A. Standing and Mootness

Defendants argue that, because both Hutton and Thayer have already graduated from WRHS, they lack standing and their claims for injunctive and declaratory relief are now moot. "It is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy." *Cole v. Oroville Union High School Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000). However, a former student's claim for damages survives. *Id.* at 1099.

Plaintiffs suggest that although they have graduated from high school they still have standing. Plaintiffs argue three different exceptions to the general rule that graduation from high school renders their claims moot. First, Plaintiffs assert they have third party standing because they are bringing the suit on behalf of the other students and faculty at WRHS who

---

[4] As explained more thoroughly below, the Eleventh Amendment would apply to the District, whereas qualified immunity would shield the individual defendants.

still have standing, but "are in a poor position to assert their legal rights because they were not fully aware of the circumstances." Dkt. 9, at 5. Second, Plaintiffs argue that their situation falls under the "capable of repetition yet evading review" exception to mootness. Third, Plaintiffs argue that the exceptional circumstances of the situation warrant an exception to the standing rule.

### 1. *Third Party Standing*

Plaintiffs argue they have standing because they are representatives of the group of students and faculty hurt by Defendants' actions. The sole authority Plaintiffs rely on for this argument is the Supreme Court case *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.* 528 U.S. 167 (2000). *Friends of the Earth* states that:

> An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right,[5] the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Id.* at 180–81. Plaintiffs believe they have standing under *Friends of the Earth* because they "have substantial relationships to the other students and faculty affected by Defendants' actions, and they are an effective proponent of those third parties' First Amendment Rights." Dkt. 9, at 5. Plaintiffs further believe Defendants violated current students and

---

[5] To sue in their own right, a member of an association would have to show that:

> (1) the member has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.* 528 U.S. 167, 180 (2000).

faculty's First Amendment rights because they were either not permitted to answer Hutton's survey questions or did not have their views represented via Thayer's report at the Board's meeting.

Plaintiffs' argument stretches the application of *Friends of the Earth* too far. Hutton and Thayer are not an association, nor part of an association with current students or faculty. According to Plaintiffs' Complaint, Hutton and Thayer are bringing the suit as individuals, not on behalf of an association. Nor is an association bringing the suit on their behalf. Further, Plaintiffs have not shown how those they claim to now represent have standing—one of the required elements of third party standing. *See Friends of Earth*, 528 U.S. at 180–81. Plaintiffs only assert that others were harmed, and perhaps others could suffer potential future harms at the hand of Defendants. This is insufficient to show that Plaintiffs have standing as representatives of the non-party students and faculty.

2. *"Capable of Repetition Yet Evading Review"*

Plaintiffs next argue that they have standing because their situation is one that is capable of repetition yet evading review. This exception to mootness applies only when "(1) the challenged action is too short in duration to be fully litigated before cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Cole*, 228 F.3d at 1098; *see also Murphy v. Hunt*, 455 U.S. 478, 482 (1982) ("[T]here must be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party.") (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

MEMORANDUM DECISION AND ORDER –9

Here, although the time period for the parties to litigate these claims was short, it was not necessarily impossible to litigate a claim fully within the time period. There are several cases of similar claims involving the First Amendment and graduation ceremonies that were able to be fully litigated before the student graduated from high school, which would have otherwise rendered the case moot. *See, e.g., Lee v. Weisman*, 505 U.S. 577 (1992); *ACLU of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471 (3rd Cir. 1996). However, Plaintiffs do contend that they made their best efforts to deal with the school first to resolve the issue before filing any sort of action. Further, it was Plaintiffs' senior year when the incidents happened, which did significantly shorten the amount of time before their claims ceased or expired. The incidents took place in the fall of 2017, the students graduated in the spring of 2018, and the action commenced in spring of 2019.

With that being said, the second prong of the "capable of repetition" test precludes standing. The second prong, which requires the possibility that Plaintiffs could be subjected to the same action by Defendants, would be impossible to meet as they both have graduated, enrolled in universities, and will not ever be students at WRHS or in the District again.

Plaintiffs reassert their argument that they are representatives of the other students still enrolled at WHRS who could be at risk for the same conduct, and therefore contend they satisfy the second prong of this exception. Plaintiffs suggest that Hunter represents a class of individuals who may be affected in the future, and that Thayer specifically, as a former student-body representative, represents her classmates, some of whom are still

attending WRHS.[6] However, the exception specifically requires that the possibility of harm will affect the "same complaining party." *Cole*, 228 F.3d at 1098. Plaintiffs have not provided any authority suggesting that the "same complaining party" requirement can be satisfied through third-party standing. Further, the Court has already analyzed Plaintiffs' assertion that they have third-party standing and found it to be lacking. Thus, Plaintiffs have failed to show that their case meets the "capable of repetition yet evading review" exception.

### 3. Exceptional Circumstances

Finally, Plaintiffs argue the Court should make an exception based on the exceptional circumstances from which this case arose. Plaintiffs suggest that students should have the same remedies available to non-student citizens who seek injunctive and declaratory relief for civil rights violations. The current standing limitations, Plaintiffs argue, result in a "clear lack of accountability" by school districts and administrators. Dkt. 9, at 7.

However, Plaintiffs have again failed to provide any authority supporting their position. Indeed, Plaintiffs' counsel stated at oral argument that there is no precedent to support this position. In other words, the Court would be creating new precedent, something the Court is loath to do, especially considering the facts of this case. The Ninth Circuit in *Cole* already considered nearly identical arguments—save the exceptional

---

[6] Plaintiffs claim that Thayer's classmates were still attending WRHS as of June 2019, when they filed this Response. The Court is unsure whether these classmates still are attending WRHS as of the date of this decision, but such a determination does not affect the Court's decision one way or the other.

circumstances argument—under nearly identical facts. In *Cole*, a number of high school graduates sought third-party standing to represent their ungraduated peers. *Cole*, 228 F.3d at 1098–1100. The *Cole* court considered numerous arguments relating to third-party standing and rejected them all. *Id.* It would be difficult for the Court to justify an exception to the rule announced in *Cole*—graduated high school students do not have standing to bring declaratory and injunctive relief claims relating back to when they were in high school—based on facts that are strikingly similar to those in *Cole.* Though alleged constitutional violations are certainly unique in every case, Plaintiffs have not shown that their circumstances are distinct enough from cases like *Cole* that would qualify them as exceptional.

In sum, there is no current exception to the standing requirement for exceptional circumstances, and even if there was one, it is unlikely Plaintiffs' circumstances would warrant it.

### 4. *Summary*

Plaintiffs have repeatedly argued they should be exempt from the established rule that graduated high school students do not have standing to bring declaratory and injunctive relief claims relating back to when they were in high school. However, each argument fails to convince the Court that Plaintiffs qualify for the exception or that such an exception exists. Therefore, Plaintiffs lack standing to bring injunctive and declaratory relief claims.[7] As Plaintiffs' § 1983 claims for damages for violations of their First and Fourteenth

---

[7] The Court thus dismisses Plaintiffs' Second and Third Causes of Action (Hutton's claims), and Fifth and Sixth Cause of Action (Thayer's claims).

Amendment rights would survive this standing issue, the Court now turns to Defendants' immunity arguments.

## B. Eleventh Amendment Immunity

Defendants argue that the District has immunity under the Eleventh Amendment, barring plaintiffs from relief. The Eleventh Amendment states that, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Local governments, however, do not have immunity from suits under the Eleventh Amendment. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 369 (2001). The key issue, then, is whether the District "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Beentjes v. Placer Cty. Air Pollution Control Dist.*, 397 F.3d 775, 777–78 (9th Cir. 2005) (internal quotations omitted).

A school district's status as an arm of the state has not been clearly decided in Idaho.[8] Thus, the Court must determine if the District is considered an arm of the state and, as such, qualifies for Eleventh Amendment immunity. In deciding whether an entity

---

[8] In 1931, the Idaho Supreme Court found that school districts were agencies of the states. *Common School Dist. No. 61 v. Twin Falls Bank & Trust Co.*, 4 P.2d 342, 343 (Idaho 1931). However, this was called into question after the passage of the Idaho Administrative Procedures Act, and was clarified by the Idaho Supreme Court: "While a school district, through its board of trustees may work with state boards, commissions, or departments, the school districts and boards of trustees are separate entities and do not constitute a state board, commission, department, or officer under I.C. Section 67-5201." *Smith v. Meridian Joint School Dist. No. 2*, 918 P.2d 583 (Idaho 1996).

asserting immunity under the Eleventh Amendment is an arm of the state, courts must consider the "*Mitchell* factors":

> (1) whether a money judgment would be satisfied out of state funds, (2) whether the entity performs central governmental functions, (3) whether the entity may sue or be sued, (4) whether the entity has the power to take property in its own name or only the name of the state, and (5) the corporate status of the entity.

*Beentjes*, 397 F.3d at 778 (citing *Mitchell v. Los Angeles Comm. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988). "To determine these factors, the court looks to the way state law treats the entity." *Mitchell*, 861 F.2d at 201. "An entity invoking Eleventh Amendment immunity bears the burden of asserting and proving those matters necessary to establish its defense." *Sato v. Orange Cty. Dep't of Educ.*, 861 F.3d 923, 928 (9th Cir. 2017).

1. *Whether a Money Judgment Against the District Would be Satisfied Out of State Funds*

Courts give additional weight to the first factor because "the impetus of the Eleventh Amendment is the prevention of federal-court judgments that must be paid out of the state's treasury." *Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1041 (9th Cir. 2003); *see also Beentjes*, 397 F.3d at 778 ("The first prong of the *Mitchell* test— whether a money judgment would be satisfied out of state funds—is the predominant factor.")

Here, Plaintiffs argue that the school district's budget is separate from Idaho's "general fund" and therefore any judgement against the District would not be satisfied with state funds. They also argue that, though the District may receive some state funds, the "commingling of state funds with federal, local, and county funds does not provide . . .

immunity because that argument also necessitates that the school district would simultaneously be an arm of the federal government and the county." Dkt. 9, at 9.

On the other hand, Defendants argue that a judgment would be satisfied out of state funds. As support, Defendants rely heavily on *Sadid v. Idaho State University*, 837 F. Supp. 2d 1168 (D. Idaho 2011). In *Sadid*, the court found that although the last three of the *Mitchell* factors weighed against Idaho State University, the university qualified for Eleventh Amendment immunity because it was still fulfilling a central government purpose and a judgment would be satisfied from state funds. *Id.* at 1174. Defendants argue that because the majority of the District's funds come from the state treasury, just as Idaho State University's funds do, the District is an arm of the state and entitled to Eleventh Amendment immunity.

However, Defendants do little to show the Court that the District is similar to Idaho State University or that a judgment against the District would be paid from state funds. The *Sadid* court cited to several cases and statutes stating the state would be the one to pay any adverse judgment against Idaho State University. *See id.* at 1173–74. In this case, Defendants have not cited to any case or statute that connects any judgment against the District to the funds of the state treasury. Indeed, many of the statues cited in *Sadid* dealt with the chapter of the Idaho Code regarding state institutions of higher education. Because the District is not a state institution of higher education, these statutes do not apply to the District. *See id.*

Defendants also look to *Belanger v. Madera Unified Sch. Dist.* 963 F.2d 248 (9th Cir. 1992) for support. In *Belanger*, the Ninth Circuit held that California school districts

were an arm of the state for Eleventh Amendment purposes. *Belanger*, 963 F.2d at 252. However, the *Belanger* court noted that "[u]nlike most states, California school districts have budgets that are controlled and funded by the state government rather than the local districts." *Id.* Specifically, the court noted there was "strict state control of public-school funding." *Id.*

Here, Defendants have not provided any evidence that Idaho's school districts are sufficiently similar enough to California's that *Belanger*'s outcome should be applied. Defendants do not cite any case, statue, or regulation that gives the state strict control over the District's funding.

In sum, the District failed to carry its burden to convince the Court that a money judgment against it would be satisfied out of state funds because it failed to provide evidence relating to how a judgment against it would be paid.[9] Thus, this factor weighs against immunity.

### 2. *Whether the District Performs Central Government Functions*

In assessing the second *Mitchell* factor, a court must evaluate whether the entity addresses "a matter of statewide rather than local or municipal concern," *see Belanger*, 963 F.2d at 253, and "the extent to which the state exercises centralized governmental control

---

[9] Defendants submitted the District's 2018-19 budget in support of their argument. Dkt. 12, at 7. The District contends that the Court is entitled to take judicial notice of the budget as it is a public record maintained by an agency of the state. The Court, at this time, declines to do so. At this stage of litigation, Defendants are in possession of the evidence regarding the District's financial relation to Idaho's treasury. Further, the Districts 2018-19 budget is lengthy and complex, and does very little to show that a judgment against the District would be satisfied out of the state of Idaho's funds. Whether a judgment against the District will be paid out of the funds of the state in this case is a more appropriate issue for summary judgment, after evidence has been exchanged and the parties are given the opportunity to retain experts.

over the entity." *Savage*, 343 F.3d at 1044. Neither party argued for or against this factor in their briefing or at oral argument.

The Idaho Constitution states that "[t]he stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools." Idaho Const. Art. IX, § 1. Based on this, it appears that the District performs central government functions. Thus, this factor weighs in favor of immunity.

### 3.   *Whether the District can Sue or be Sued*[10]

"[T]his factor is entitled to less weight than the first two factors." *Belanger*, 963 F.2d at 254; *see also Sadid*, 837 F.Supp.2d at 1174 (questioning "the prudence of giving any serious weight to this factor"). Broadly speaking, this is because the fact that an entity can sue or be sued in its own name does not necessarily mean that the entity is or is not an arm of the state. *See Belanger*, 963 F.2d at 254. Nonetheless, pursuant to Idaho Code, the District "may sue or be sued . . ." Idaho Code § 33-301. Thus, this factor weighs against immunity, albeit less so than the other factors.

### 4.   *Whether the District May Take Property in its Own Name*

Idaho law establishes a school district's ability to "acquire, hold and convey real and personal property necessary to its establishment, extension and existence." *Id.* Thus, this factor weighs against immunity.

---

[10] Defendants do not provide any argument for the last three factors of the *Mitchell* analysis.

*5. The Corporate Status of the District*

Idaho law  states that a school district "is declared to be a body corporate and politic." *Id.* Thus, this factor weighs against immunity.

*6. Summary*

After weighing the *Mitchell* factors, the Court finds that, at this time, Defendants have not established that the District is entitled to Eleventh Amendment immunity. However, at this stage of litigation there is very little evidence addressing whether a money judgment would be paid out of the state funds, which is the first—and most important—*Mitchell* factor. *See Savage*, 343 F.3d at 1041; *see also Stoner v. Santa Clara Cy. Office of Educ.*, 502 F.3d 1116, 1122–23 (9th Cir. 2007) (considering only the first *Mitchell* factor in concluding that a California school district qualified for Eleventh Amendment immunity). As such, the Court will allow Defendants to again raise this defense at the summary judgment stage after the parties have had the opportunity to flesh out the issue.

## C. Qualified Immunity

Defendants also argue that the individual defendants are entitled to qualified immunity.[11] The Ninth Circuit employs a two-part test to decide whether qualified immunity applies:

> First, we decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right. Second, we decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct.

---

[11] Because the District is an institutional defendant it cannot enjoy qualified immunity. *See Frudden v. Pilling*, 877 F.3d 821, 833 (9th Cir. 2017). Thus, the qualified immunity argument only applies to Plaintiffs' claims for damages against the individual defendants.

*Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017). "A right is clearly established for purposes of qualified immunity only where '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 831 (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)). Thus, the issue of qualified immunity turns on whether the Defendants violated any clearly established constitutional rights of Hutton or Thayer.

*1. Hutton's First Amendment Claims*

First, the Court must analyze whether Plaintiffs have alleged sufficient facts to make out a violation of a constitutional right. The First Amendment guarantees the right to free speech. U.S. Const. Amend. I. Neither "students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969). The Supreme Court has held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are *reasonably related to legitimate pedagogical concerns*." *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988) (emphasis added). Under the *Hazelwood* standard, a school may disassociate itself from speech that is "ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences" as well as any speech that would "substantially interfere" with the school or "impinge on the rights of other students." *Id.* at 271.

The Defendants argue they did not violate any of Hutton's rights because the District's officials had the "right of editorial control over the speech because it bore the

imputer of the school." Dkt. 6, at 12. In doing so, Defendants compare Hutton's questionnaire to the school newspaper in *Hazelwood*. In *Hazelwood*, the Supreme Court found that school officials were entitled to regulate the school newspaper—specifically that they were entitled to remove two stories that dealt with teen pregnancy and divorce in the school—because those actions were related to a legitimate pedagogical concern. *Id.* at 276. According to Defendants, because Hutton disseminated the questionnaire on the District's Google Drive account, it would be reasonable to believe that the administration had sanctioned the communication. Further, Defendants argue that Hutton's questionnaire is akin to a performance evaluation of Holmes, and that performance evaluations are subject to control by school officials because a performance evaluation must follow certain privacy control laws, namely Idaho Code section 74-106. In other words, Defendants argue that the legitimate, pedagogical concern for deleting Hutton's questionnaire was that they might be in violation of Idaho Code section 74-106 if they did not delete her questionnaire.

The Court finds that Defendants have not given a legitimate, pedagogical concern for deleting Hutton's questionnaire for two reasons. First, Defendants have not sufficiently demonstrated why or how Hutton's opinion poll is akin to a professional performance evaluation, which was Holmes' basis for deleting it. The questionnaire, written by a high school student, asked thirty random students and staff if they had a positive or negative opinion of Holmes' job performance. The Court believes this to be quite different from a performance evaluation conducted by an authorized, qualified person under Idaho Code section 74-106.

Second, even if it was reasonable to believe that this questionnaire was a performance evaluation, Defendant's decision to delete it is not tied to any legitimate pedagogical concern. The statute Defendants rely on—Idaho Code section 74-106—simply exempts "performance evaluations" from disclosure under Idaho's Public Records Act "without the employee's . . . written consent." Idaho Code § 74-106. Hutton did not send the questionnaire out to the general public, and nowhere is it argued that any person made a public records request for Hutton's alleged "performance evaluation." It strains reasoning to qualify this concern as a legitimate, pedagogical one. Instead, it appears that Defendants—specifically Holmes—severely overreacted to a student poll that potentially could reflect a negative opinion about her. This would explain why Holmes ordered Hutton's assignment be deleted without consulting or explaining the decision to Hutton, and why Hutton's teacher was required to apologize to Holmes. Thus, accepting the facts of the Complaint as true, Hutton has stated a plausible claim for a violation of her First Amendment rights.

Next, the Court must evaluate if the right was clearly established at the time of the violation. As the Supreme Court has held, neither "students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. Few cases have examined the right of students to engage in free speech, but the right itself has been clearly established at least since 1969 in the *Tinker* holding. Further, *Hazelwood*—decided in 1988—clearly establishes that a school may exercise control over a student's right to free speech only when it does so pursuant to a legitimate, pedagogical concern. As the Complaint alleges facts necessary to make out a violation of

a clearly established right, Defendants are not entitled to qualified immunity at this stage of the proceedings.

### 2. *Hutton's Fourteenth Amendment Claims*

Defendant's argue that Hutton's Fourteenth Amendment claim also fails as a matter of law because the Fourteenth Amendment applies only when a constitutionally protected liberty or property interest is at stake. In making this argument, Defendants assume that Hutton does not have a constitutionally protected liberty at stake, *i.e.* that the Court will dismiss Hutton's First Amendment claim. However, because the Court has found that Hutton has alleged sufficient facts to plead a First Amendment violation, such a violation would invoke the protection of the Fourteenth Amendment. Thus, Hutton's Fourteenth Amendment claim survives.

### 3. *Thayer's First Amendment Claims*

Thayer alleges that Defendants redacted her report after she submitted it to the Board. Thayer argues that this redaction violated her First Amendment rights because Defendants denied her the opportunity to present her full report to the Board. Defendants dispute that Thayer's report was redacted in the first place, and alternatively argue that the timing of graduation is of a "legitimate pedagogical" concern as is the method and content of reports to the Board. Additionally, Defendants argue that, because Thayer subsequently did have the opportunity to present her report during an open session in front of the Board, she has not sufficiently alleged a violation of any constitutional right and therefore her First Amendment claim fails.

MEMORANDUM DECISION AND ORDER –22

Although the decision and timing of graduation is of a legitimate pedagogical concern, preventing a student from expressing their disagreement with that decision is not. A student's concerns over the date of graduation does not force the Board to take any action at all. Had Defendants allowed Thayer to submit her unredacted report, the Board still reserved control over and the right to decide the date of graduation. Thayer was merely attempting to express her opinion and the opinion of the student body she represented, something the District's Policy specifically called for. Not allowing that opinion to be expressed is a prohibition based on "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular view," or an "urgent wish to avoid the controversy which might result from the expression." *Tinker,* 393 U.S. at 509–10. Further, that Thayer may have eventually been able to present the redacted portion of her report does not erase Defendant's unlawful acts in the first place. Though Thayer's later presentation might have an impact on the harm Thayer suffered, it does not remedy Defendant's wrongdoing.

As the Court has already stated, a student's First Amendment rights to free speech are clearly established. Thus, just as with Hutton's First Amendment claim, and in the absence of a legitimate pedological concern, the Court cannot find Defendants are entitled to qualified immunity on Thayer's First Amendment claim at this time.

### 4. Thayer's Fourteenth Amendment Claims

Identical to Hutton's Fourteenth Amendment claim, Defendants argue that Thayer's Fourteenth Amendment claim must be dismissed because she cannot show that she had a constitutionally protected liberty or a property interest at stake. Again, this argument

presupposes that Defendants did not violate Thayer's First Amendment rights. As the Court has found Thayer has sufficiently pled a First Amendment violation, Thayer may also proceed with her Fourteenth Amendment claim

## D.  Leave to Amend

Leave to amend pleadings shall be freely given when justice so requires. Fed. R. Civ. P. 15(a). Courts apply Rule 15 with extreme liberality. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citations omitted). In determining whether to grant leave to amend, the court generally considers five factors: (1) undue delay; (2) bad faith; (3) futility of amendment; (4) prejudice to the opposing party; and (5) whether the plaintiff has previously amended the complaint. *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011) (citation omitted). These factors are not weighted equally: futility of amendment alone can justify the denial of a motion to amend. *Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009).

Here, the Court is dismissing Plaintiffs' Second, Third, Fifth, and Sixth causes of action due to Plaintiffs' lack of standing. Put differently, these causes of action are barred as a matter of law and any attempt to amend would be futile. Thus, these causes of action will be DISMISSED WITH PREJUDICE.

## V. MOTION TO BIFURCATE

Defendants have also filed a Motion to Bifurcate in the event that any of Plaintiffs' claims survive the motion to dismiss. Dkt. 7. Defendants seek to bifurcate trial of the claims made by Hutton from those made by Thayer. District courts are authorized to bifurcate a

trial for any of the following reasons: (1) convenience, (2) to avoid prejudice, and/or (3) to expedite and economize. Fed. R. Civ. P. 42(b).

Defendants argue that this case should be bifurcated "to promote convenience to the parties and witnesses, to avoid prejudice to the defendants, to expedite and economize discovery and trial, and because the questions of law and fact raised by Hutton and Thayer are significantly different." Dkt. 8, at 2. Defendants suggest two separate cases would be more convenient because, though there is a slight overlap, the witnesses and evidence are different. Defendants also argue not bifurcating risks prejudice and confusion between the two situations, and would cause "undue delay, waste of time, and additional expense to the parties due to duplicate discovery and testimony." Defendants also contend that separating the cases would serve judicial economy because the cases would be "streamlined based upon their unique facts." Dkt. 8, at 6–7.

Plaintiffs contend that separating the case would result in twice the amount of work for both parties. They also claim that there would be no risk of prejudice and that the risk of confusion among jurors is low because these are not factually complicated situations. Further, Plaintiffs suggest that keeping the case as one would be better because the issues of fact and resolution would be faster and be of less expense to both the court and the parties. Plaintiffs also argue that the questions of fact and law are sufficiently similar because their causes of action and relief requested are the same.

The Court agrees that bifurcating the case would cause undue expense and duplicative work for the parties, at least during discovery. The Court is concerned, though, with the prejudice Defendants would face if one jury was to hear both Hutton and Thayer's

cases. As such, Defendants' Motion to Bifurcate is DENIED WITHOUT PREJUDICE.

Should this case proceed to trial, Defendants may renew their Motion to Bifurcate.

## VI. ORDER

**IT IS HEREBY ORDERED THAT**:

1. Defendant's Motion to Dismiss (Dkt. 5) is GRANTED in part and DENIED in part. Plaintiffs' Second, Third, Fifth, and Sixth causes of action are DISMISSED WITH PREJUDICE. However, Plaintiffs may proceed with their First and Fourth causes of action.

2. Defendant's Motion to Bifurcate (Dkt. 7) is DENIED WITHOUT PREJUDICE, as outlined above.

DATED: March 23, 2020

David C. Nye
Chief U.S. District Court Judge